IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**SABAN RENT-A-CAR LLC, ET AL.,**
*Plaintiffs/Appellees/Cross-Appellants,*

*v.*

**ARIZONA DEPARTMENT OF REVENUE,**
*Defendant/Appellant/Appellee/Cross-Appellee,*

---

**TOURISM AND SPORTS AUTHORITY,**
*Defendant-in-Intervention/Appellant/Cross-Appellee.*

---

No. CV-18-0080-PR
Filed February 25, 2019

---

Appeal from the Arizona Tax Court
The Honorable Dean M. Fink, Judge
The Honorable Christopher T. Whitten, Judge
No. TX2010-001089
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division One
244 Ariz. 293 (App. 2018)
**AFFIRMED**

---

COUNSEL:

Shawn K. Aiken (argued), Shawn Aiken PLLC, Phoenix; Gregory D. Hanley, Kickham Hanley PLLC, Royal Oaks, MI; Taylor C. Young, Robert A. Mandel, Mandel Young PLC, Phoenix, Attorneys for Saban Rent-a-Car LLC

Mark Brnovich, Arizona Attorney General, Phoenix, Kimberly Cygan, Jerry A. Fries, Assistant Attorneys General, Phoenix; Thomas L. Hudson (argued), Eric M. Fraser, Osborn Maledon, P.A., Phoenix, Attorneys for Arizona Department of Revenue

Timothy Berg (argued), Janice Procter-Murphy, Emily Ward, Fennemore Craig, P.C., Phoenix; and Scot L. Claus, Vail C. Cloar, Dickinson Wright PLLC, Phoenix, Attorneys for Tourism and Sports Authority

Lawrence A. Kasten, Lewis Roca Rothgerber Christie LLP, Phoenix, Attorneys for Amicus Curiae John Halikowski, Director, Arizona Department of Transportation

Michael R. King, Cameron C. Artigue, Christopher L. Hering, Gammage & Burnham, PLC, Phoenix, Attorneys for Amici Curiae Convention and Visitors Bureaus

Barbara LaWall, Pima County Attorney, Regina L. Nassen, Deputy County Attorney, Tucson, Attorneys for Amici Curiae Pima County and the Pima County Stadium District

Paul F. Eckstein, Thomas D. Ryerson, Perkins Coie LLP, Phoenix, Attorneys for Amicus Curiae City of Phoenix

Michael K. Kennedy, Mark C. Dangerfield, Gallagher & Kennedy, P.A., Phoenix, Attorneys for Amici Curiae The Arizona Chamber of Commerce & Industry and The Greater Phoenix Chamber of Commerce

———————

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE BRUTINEL, and JUSTICES PELANDER, GOULD, and LOPEZ joined. JUSTICE BOLICK authored an opinion concurring in part and dissenting in part.

JUSTICE TIMMER, opinion of the Court:

¶1 Maricopa County imposes a surcharge on car rental agencies to fund a stadium and other sports and tourism-related ventures. The issue here is whether this surcharge violates the dormant Commerce Clause implied by Article I, Section 8, Clause 3 of the United States Constitution or the anti-diversion provision, article 9, section 14 of the Arizona Constitution. We hold that it does not violate either provision.

**BACKGROUND**

¶2 The legislature created the Arizona Tourism and Sports Authority (the "AzSTA") in 2000 to build and operate a sports stadium, build Major League Baseball spring training facilities, build youth and amateur sports and recreation facilities, and promote tourism. *See* A.R.S. §§ 5-801(4), -802(A), -807 to -809, -815. AzSTA's authority is restricted to counties with populations greater than two million people, meaning it has only ever operated in Maricopa County. *See* § 5-802(A). AzSTA's construction projects are funded solely by taxes and surcharges approved by Maricopa County voters. *See* § 5-802(C). One such voter-approved surcharge is at issue here.

¶3 Soon after the creation of AzSTA, Maricopa County voters passed an initiative that levied a surcharge on car rental companies based on their income derived from leasing vehicles for less than one year. *See* A.R.S. § 5-839(A)–(C) (authorizing voters to levy the surcharge and providing its terms). (The initiative also imposed a tax on hotels. The hotel tax is not at issue here.) The surcharge is the greater of $2.50 per rental or 3.25% of the company's gross proceeds or gross income. § 5-839(B)(1). If the rental is a "temporary replacement" for a damaged or lost vehicle, however, the surcharge is a flat $2.50. § 5-839(B)(2). The state treasurer distributes $2.50 per rental transaction to the Maricopa County Stadium District, which has collected a surcharge in this amount since 1991. *See* § 5-839(G)(1); Act of June 25, 1991, ch. 285, § 10, 1991 Ariz. Sess. Laws 1444, 1451–53 (1st Reg. Sess.) (codified at A.R.S. § 48-4234). The remaining amount, the difference between $2.50 per rental transaction and 3.25% of the company's gross income or proceeds, is distributed to AzSTA. § 5-839(G)(2). Although the surcharge is imposed on car rental companies, they can and do pass its cost on to their customers.

¶4 Plaintiff Saban Rent-a-Car ("Saban") rents vehicles in Maricopa County and has paid the car rental surcharge. Its customers are primarily local residents. In 2009, after unsuccessfully seeking a refund from the Arizona Department of Revenue ("ADOR"), Saban sued ADOR in the tax court and sought refunds and injunctive relief for all similarly situated car rental companies. The tax court certified a class of all individuals or entities that paid the surcharge from September 2005 through March 2008 and allowed AzSTA to intervene as a defendant.

¶5 As it does here, Saban argued to the tax court that the surcharge violates both the dormant Commerce Clause and the anti-diversion provision. On cross-motions for summary judgment, the court agreed with ADOR and AzSTA that the surcharge does not violate the dormant Commerce Clause. It agreed with Saban, however, that the surcharge violates the anti-diversion provision. Consequently, the court granted summary judgment for Saban and ordered ADOR to refund the surcharge payments to class members. The court also authorized ADOR to recoup the refund amounts from AzSTA pursuant to A.R.S. § 42-5029(G).

¶6 Like the tax court, the court of appeals ruled that the surcharge does not violate the dormant Commerce Clause. *Saban Rent-A-Car LLC v. Ariz. Dep't of Revenue*, 244 Ariz. 293, 296 ¶ 2 (App. 2018). But unlike the tax court, the court of appeals concluded that the surcharge also does not violate the anti-diversion provision. *Id.* It therefore reversed the tax court's ruling and remanded for entry of summary judgment in favor of ADOR and AzSTA. *See id.* at 308 ¶ 49.

¶7 We granted review to address these legal issues of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

### I.     The Dormant Commerce Clause

¶8 We review the constitutionality of the car rental surcharge de novo, as a question of law. *See Gallardo v. State*, 236 Ariz. 84, 87 ¶ 8 (2014). Likewise, "[w]e review questions of statutory construction and grants of summary judgment de novo." *BSI Holdings, LLC v. Ariz. Dep't of Transp.*, 244 Ariz. 17, 19 ¶ 9 (2018). We presume that a statute not involving fundamental constitutional rights or suspect-classification distinctions is constitutional "and will uphold it unless it clearly is not." *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 5 ¶ 11 (2013).

¶9 The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. By negative implication, states cannot unjustifiably discriminate against or erect barriers to interstate commerce. *See Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 98 (1994). This implied restraint is known as the "dormant Commerce Clause" and serves to prevent "economic

protectionism[,] that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008); *see also Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997) (describing the dormant Commerce Clause's fundamental objective as "preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors"). The principles developed under the dormant Commerce Clause to counter economic Balkanization, however, have respected a degree of local autonomy, as favored by the Framers. *See Davis*, 553 U.S. at 338; *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350 (1977) (recognizing that "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it" (internal quotation marks omitted)).

¶10         To determine if a law violates the dormant Commerce Clause, courts initially ask whether the law "regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce." *Or. Waste Sys.*, 511 U.S. at 99 (internal quotation marks omitted). If a law is discriminatory, it will survive only if its proponents "show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* at 100–01 (internal interlineations and quotation marks omitted). Courts have sometimes noted that such scrutiny renders a law "virtually *per se* invalid." *See id.* at 99. If the challenged law is non-discriminatory but incidentally affects interstate commerce, a balancing test is used, and the law will be upheld unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

¶11         Saban argues the car rental surcharge is discriminatory and thus subject to strict scrutiny review. A "discriminatory" tax is one that is "facially discriminatory, has a discriminatory intent, or has the effect of unduly burdening interstate commerce." *Amerada Hess Corp. v. Dir., Div. of Taxation, N.J. Dep't of the Treasury*, 490 U.S. 66, 75 (1989). Saban abandons prior assertions that the surcharge is facially discriminatory and unduly burdens interstate commerce, *see Saban*, 244 Ariz. at 303 ¶ 30, 304 ¶ 32, and solely argues the surcharge is "invalid because it was motivated by discriminatory intent, that is, forcing out-of-state visitors [to] pay a special tax that residents are shielded from." ADOR and AzSTA counter that the

surcharge was not enacted with a discriminatory intent but, even if it was, intent alone is an insufficient reason to invalidate the surcharge.

¶12	The car rental surcharge was not enacted with a discriminatory intent, as that term is used in Commerce Clause jurisprudence. Discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys.*, 511 U.S. at 99. Nothing in the language of the surcharge or in the publicity pamphlet for the initiative enacting the surcharge suggests an intent to treat in-state and out-of-state interests differently or engage in the type of "economic protectionism" at odds with the Commerce Clause. Indeed, the surcharge applies equally to resident and non-resident car rental agencies operating in Maricopa County and is calculated and imposed without regard to their customers' residencies.

¶13	Saban nevertheless argues that discriminatory intent exists because statements in the initiative's publicity pamphlet suggest voters targeted non-resident visitors, who purportedly rent most vehicles offered by car rental agencies, to pay the lion's share of the surcharges. But even if true, this does not evidence an intent that out-of-state visitors be *treated* any differently from residents, as required to be discriminatory. *See id.* The fact that visitors as a group pay most of the surcharges collected by car rental agencies is not "discriminatory."

¶14	The Supreme Court's decision in *Commonwealth Edison Co. v. Montana*, 453 U.S. 609 (1991), is illuminative. There, the Court concluded that Montana's tax on the sale of coal did not violate the dormant Commerce Clause even though most of the tax burden was borne by out-of-state consumers. *Id.* at 618, 636. The Court expressed misgivings about judging the validity of a state tax on "its 'exportation' of the tax burden out of State," as the challengers there urged. *Id.* at 618. It noted that for purposes of promoting free trade under the Commerce Clause, state borders are "essentially irrelevant" and reasoned that "invalidat[ing] the Montana tax solely because most of Montana's coal is shipped across the very state borders that ordinarily are to be considered irrelevant would require a significant and, in our view, unwarranted departure from the rationale of our prior discrimination cases." *Id.* at 618–19. The Court also disagreed with the challengers' argument that out-of-state consumers should be protected from discriminatory tax treatment, pointing out "there is no real discrimination in this case; the tax burden is borne according to

6

the amount of coal consumed and not according to any distinction between in-state and out-of-state consumers." *Id.* at 619.

**¶15**     Although *Commonwealth Edison* addressed the purported discriminatory effect of Montana's coal tax, the Court's reasoning also reveals the meaning of "discriminatory intent" under the dormant Commerce Clause.   Just as a tax that does not differentiate between interstate and intrastate commerce does not have a "discriminatory effect" when the tax burden is borne primarily by out-of-state consumers, those who enacted the tax intending that consequence did not do so with a "discriminatory intent." *Cf. Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270–71 (1984) (stating that the Hawaii legislature acted with discriminatory intent by exempting only certain Hawaiian-made alcohol from alcohol tax to encourage and promote Hawaiian industry).   Concluding otherwise would mean the validity of a tax would turn on serendipity:  one state's tax that happens to be disproportionately paid by non-residents would be valid, *see Commonwealth Edison*, 453 U.S. at 618–19, while the same tax in another state would be invalid only because its enactors intended that result.  Because the surcharge here, like the Montana coal tax, is imposed even-handedly and does not distinguish between in-state and out-of-state car rental agencies or consumers, any intent by voters that out-of-state visitors ultimately pay most of the surcharge was not "discriminatory."

**¶16**     Saban argues that the car rental surcharge is like the Maine tax scheme that the Supreme Court invalidated under the dormant Commerce Clause in *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564 (1997).  Maine provided a complete property and personal tax exemption for charitable organizations incorporated in the state but only if they did not operate principally for the benefit of non-residents.  *Id.* at 568. As a result, a church camp catering mostly to out-of-state campers was required to pay taxes while organizations operating camps attracting mostly Maine residents were exempt.  *Id.* at 568–69.  The Court found the Maine tax scheme facially discriminatory because it expressly "singl[ed] out camps that serve mostly in-staters for beneficial tax treatment, and penaliz[ed] those camps that do a principally interstate business."  *Id.* at 575–76.  It also analogized the discriminatory exemption to prohibited special fee assessments charged nonresidents for use of local services, noting "Maine's facially discriminatory tax scheme falls by design in a predictably disproportionate way" on non-residents and has the same "pernicious effect on interstate commerce."  *Id.* at 578–80; *see also id.* at 579

n.13 (stating "the [Maine] tax scheme functions by design and on its face to burden out-of-state users disproportionately").

¶17 We disagree with Saban that the car rental surcharge is tantamount to Maine's scheme to disproportionately burden non-residents who used services provided by in-state charitable organizations. The disproportionate burden in *Camps Newfound/Owatonna* referred to the costs placed only on non-residents for using in-state services. *See id.* at 578–79 (explaining that the discriminatory exemption is effectively no different from imposing a penalty on activity). It did not refer to the disparate impact on non-residents that stems solely from the fact that they consume more of the uniformly taxed good or service than in-state consumers. *See id.* at 580 n.13 (distinguishing *Commonwealth Edison* because although non-residents bore most of the Montana coal tax burden by virtue of buying most of the coal, the tax was based on consumption and made no distinctions between resident and non-resident consumers). Like the tax in *Commonwealth Edison*, and unlike the exemption in *Camps Newfound/Owatonna*, the car rental surcharge is imposed uniformly on all car rental agencies, and ultimately on their customers, regardless of the agencies' or customers' residency status.

¶18 Saban also argues that voters acted with discriminatory intent by "exempting" temporary replacement vehicles "as a proxy for an overt exemption for the 'ordinary Arizona citizen.'" *See* § 5-839(B)(2). We disagree. First, temporary replacement vehicles are not exempted from the surcharge. Rather, the surcharge is calculated at $2.50 per vehicle rather than the greater of $2.50 per rental or 3.25% of the company's gross proceeds or gross income, as the surcharge is calculated for other rentals. *See* § 5-839(B)(1)–(2). Second, nothing suggests car rental agencies pass through more than $2.50 per rental to ordinary renters, thereby suggesting that those renting temporary replacement vehicles are treated more favorably. Indeed, according to its owner, Saban, like other car rental agencies, charges the same surcharge rate to all its customers. Third, the temporary replacement vehicle calculation applies whether the renter is a resident or a non-resident. And because numerous non-residents temporarily relocate to Arizona during the year, it is likely that many non-residents rent temporary replacement vehicles.

¶19 In sum, the voters did not enact the car rental surcharge with a discriminatory intent because they did not intend to treat in-state and out-of-state economic interests differently. As a result, the surcharge does

not trigger strict scrutiny review. Because Saban does not assert that the tax court or court of appeals misapplied the *Pike* balancing test, we do not address that issue. And considering our decision, we do not resolve the extent to which discriminatory intent alone can invalidate a tax under the dormant Commerce Clause. We note, however, that as Saban acknowledged at oral argument, a tax must burden interstate commerce in some way to be invalidated under that clause. *Cf. Or. Waste Sys.*, 511 U.S. at 98 (describing dormant Commerce Clause as addressing discrimination against or erection of barriers to interstate commerce).

## II.    The Anti-Diversion Provision

**¶20**        The anti-diversion provision, article 9, section 14 of the Arizona Constitution, provides in relevant part as follows:

> No moneys derived from fees, excises, or license taxes relating to registration, operation, or use of vehicles on the public highways or streets or to fuels or any other energy source used for the propulsion of vehicles on the public highways or streets, shall be expended for other than highway and street purposes.

The parties agree the car rental surcharge is an excise and is unrelated to vehicle registration. The only issue, therefore, is whether the surcharge "relat[es] to [the] . . . operation[] or use of vehicles," which determines whether surcharge revenues must be used for road-related purposes. Resolution of this issue turns on the meaning of "relating to."

**¶21**        Our primary goal in interpreting the anti-diversion provision is to effectuate the electorate's intent in adopting it. *See Jett v. City of Tucson*, 180 Ariz. 115, 119 (1994). If we can discern the provision's meaning from its language alone, we will apply it without further analysis. *See id.* In doing so, however, we do not apply "[f]ine semantic or grammatical distinctions, legalistic doctrine [or] pars[e] . . . sentences," as doing so "may lead us to results quite different from the objectives which the framers intended to accomplish." *United States v. Superior Court*, 144 Ariz. 265, 275–76 (1985). "Constitutions, meant to endure, must be interpreted with an eye to syntax, history, initial principle, and extension of fundamental purpose." *Id.*; *cf. Heath v. Kiger*, 217 Ariz. 492, 495 ¶ 12 (2008) ("[C]ourts should avoid hypertechnical constructions that frustrate legislative intent." (quoting *State v. Estrada*, 201 Ariz. 247, 251 ¶ 19 (2001)).

¶22        Saban argues that a fee, excise, or tax "relating to" the use or operation of vehicles plainly means one that is "connected to" driving vehicles on Arizona roads.  And because the surcharge is passed through to car rental customers and "[c]ustomers rent cars to use them" on Arizona roads, Saban contends the surcharge falls within the anti-diversion provision.  But Saban, somewhat anomalously, concedes that "'related to' could have an almost unlimited reach if construed too broadly" and thus must be limited.  We accept this concession.  As the court of appeals explained, interpreting "relating to" as having any connection to the use or operation of vehicles on the pubic highways would encompass revenues that voters clearly did not intend to be covered, including those from "retail sales or business privilege taxes on car sales, tire sales, car leases and car repairs."  *See Saban*, 244 Ariz. at 298 ¶ 10, 301 ¶ 23.  Because we cannot discern the meaning of "relating to" from the language of the anti-diversion provision alone, we consider its text in conjunction with the history and purpose of the provision.

¶23        The anti-diversion provision's origins are rooted in the early proliferation of automobiles in the United States, which sparked a need for a more extensive road network.  *See* Chad D. Emerson, *All Sprawled Out: How the Federal Regulatory System Has Driven Unsustainable Growth*, 75 Tenn. L. Rev. 411, 437–38 (2008).  Although state and local governments had traditionally borne the costs of building, improving, and maintaining roads, Congress passed the Federal Aid Road Act in 1916 to provide funding assistance.  *See id.* at 432–33, 438.  Even so, states, including Arizona, soon looked to new revenue sources, like gasoline taxes, to pay increasing costs rather than raising existing taxes.  *See id.* at 438 (stating, for example, that by the end of the 1920s, every state had adopted a gasoline tax); *Texas Co. v. State*, 31 Ariz. 485, 487 (1927) (addressing Arizona's gasoline tax passed in 1921).

¶24        Congress passed the Hayden-Cartwright Amendment in 1934, which, in part, amended the Federal Aid Road Act by reducing federal aid to states that had imposed taxes on motor-vehicle transportation to fund roads before 1935 but thereafter diverted those tax revenues to non-road-related purposes.  *See* Hayden-Cartwright Amendment of 1934, Pub. L. No. 73-393, § 12, 48 Stat. 993, 995 (1934).  Specifically, the Amendment provided:

> Since it is unfair and unjust to tax motor-vehicle transportation unless the proceeds of such taxation are applied to the construction, improvement, or maintenance of

highways, after June 30, 1935, Federal aid for highway construction shall be extended only to those States that use at least the amounts now provided by law for such purposes in each State from State motor vehicle registration fees, licenses, gasoline taxes, and other special taxes on motor-vehicle owners and operators of all kinds for the construction, improvement, and maintenance of highways and administrative expenses in connection therewith . . . .

*Id.* Rather than risk reduced federal funding by failing to devote road-user tax revenues to road uses at less than 1934 levels, "all states have, by custom, statute or constitution, pledged highway user taxes to highway construction." Jerry L. Mashaw, *The Legal Structure of Frustration: Alternative Strategies for Public Choice Concerning Federally Aided Highway Construction*, 122 U. Pa. L. Rev. 1, 8 (1973).

¶25 Arizona reacted to the Hayden-Cartwright Amendment and ensured stable roadway funding by passing the "Better Roads Amendment" referendum in 1952, which added the anti-diversion provision to the state constitution. The publicity pamphlet mailed to all voters contained a "pro" argument from the Arizona Better Roads Committee's chair, who described the provision's purpose as "insur[ing] the expenditure of all revenues derived from road users to road uses only." *See* Ariz. Sec'y of State, 1952 Publicity Pamphlet 3 (1952), http://azmemory.azlibrary.gov/digital/collection/statepubs /id/10641 (hereinafter "Pamphlet"); *Ariz. Early Childhood Dev. & Health Bd. v. Brewer*, 221 Ariz. 467, 471 ¶ 14 (2009) (stating publicity pamphlets can be examined to ascertain electorate's intent in passing a measure). He quoted the Hayden-Cartwright Amendment's rationale that diverting such tax revenues would be "unfair and unjust," *see supra* ¶ 24, and noted the importance of not "jeopardiz[ing] federal aid by allowing any diversion of road user taxes to other than road purposes." Pamphlet, *supra*, at 4–5. (The Pamphlet did not contain other arguments.)

¶26 Saban argues that the text, purpose, and history of the anti-diversion provision demonstrate it applies to tax revenues "connected to" use or operation of vehicles on roads, as limited by an historically grounded "benefits theory of taxation." Specifically, the provision applies only to taxes and fees specially imposed on "those who impose wear and tear or otherwise benefit from using the roads."

**¶27** ADOR and AzSTA argue that Saban's "benefits theory" limitation is illusory as it would give "relating to" an unlimited application that voters did not intend. They urge the court of appeals' narrower view that "relating to . . . the . . . use[] or operation of vehicles" refers to "a tax or fee that is a prerequisite to, or triggered by, the legal operation or use of a vehicle on a public thoroughfare." *See Saban*, 244 Ariz. at 302 ¶ 25. We agree with the court of appeals' interpretation.

**¶28** First, the provision's text supports a narrower interpretation of the disputed phrase than one meaning "connected to" or benefitting from road usage. The provision applies to two categories of taxes: (a) those "relating to" the "registration, operation, or use of vehicles," and (b) those imposed on fuels and other energy sources used to propel vehicles. *See* Ariz. Const. art. 9, § 14. Registration fees and fuel taxes are "connected to" the use or operation of vehicles. Owners register vehicles to use the roads. And fuel sellers indisputably benefit from their customers' use and operation of vehicles. The explicit mention of registration fees and fuel taxes therefore suggests that tax revenues "relating to . . . the . . . operation, or use of vehicles" encompass a more finite tax class than revenues derived from those with a "connection to" road usage or who benefit from it. Otherwise, as the court of appeals noted, the references to registration fees and fuel taxes would be superfluous. *See Saban*, 244 Ariz. at 298 ¶ 13; *see also Fields v. Elected Officials' Ret. Plan*, 234 Ariz. 214, 218 ¶ 16 (2014) (rejecting proposed interpretation of constitution that would render language meaningless). Interpreting "relating to" as the court of appeals did gives meaning to all terms.

**¶29** We are unpersuaded by Saban's assertion that the legislature explicitly mentioned registration fees and fuel taxes in the Better Roads Amendment referendum simply to remove any doubt they were covered. We presume the legislature avoids redundancy in favor of concision and see no reason to conclude otherwise here. *See City of Phx. v. Glenayre Elecs., Inc.*, 242 Ariz. 139, 147 ¶ 32 (2017). We also disagree with Saban that the legislature demonstrated a penchant for redundancy by referring to revenues from both the "operation" and "use" of vehicles. They are different. The former refers to fees imposed on *drivers* while the latter refers to taxes and fees assessed on *vehicles*. *See, e.g.*, A.R.S. §§ 28-3002(A) (setting fees for driver licenses), -5471(A) (setting vehicle registration fees).

¶30        Second, the anti-diversion provision's history supports the court of appeals' interpretation.  The Pamphlet identified non-fuel-related revenues dedicated to roads as "registration fees, unladen weight fees on common and contract motor carriers, and motor carrier taxes based on gross receipts" that are all "derived from road users."  *See* Pamphlet, *supra*, at 3.  All these taxes and fees are prerequisites for or triggered by the legal use of vehicles on our roads.  None are imposed on businesses, like car rental agencies, that merely benefit from the existence of roads.

¶31        Notably, the Pamphlet also stated that adopting the referendum would maintain the status quo as Arizona was then using all road-user taxes for road uses.  Pamphlet, *supra*, at 5 ("Arizona is in a particularly favorable position to adopt [the anti-diversion provision] this year, because it is not now diverting its road user taxes . . . [and passage] will entail no change in the source or expenditure of highway revenues.").  Yet Arizona had imposed transaction privilege taxes on car rental agencies since 1935 and used those revenues for general purposes.  *See Saban*, 244 Ariz. at 299 ¶ 15 (relating history of transaction privilege tax on car rental agencies).  This history suggests that neither the referendum drafter (the legislature) nor voters considered existing taxes on car rental agencies to be "road user taxes" or intended to include such taxes within the provision's ambit.

¶32        Saban agrees that 1952 voters did not intend that the anti-diversion provision apply to transaction privilege taxes on car rental agencies.  It nevertheless argues that the car rental surcharge is distinguishable, likening it to the license tax Arizona imposed on common and contract motor carriers of property and passengers in 1952, which the Pamphlet described as a road-user tax that would be subject to the provision.  *See* Act of Mar. 18, 1933, ch. 100, §§ 2, 17, 1933 Sess. Laws 472, 473–74, 481–82 (codified at Ariz. Ann. Code §§ 66-502, -518 (1939)); Pamphlet, *supra*, at 3, 5.  Specifically, Saban asserts that, like the motor carrier license tax, the surcharge is a "special tax" not imposed generally on all businesses but aimed at "motor vehicle owners and operators of all kinds" who benefit from using Arizona roads.  According to Saban, and echoing the Hayden-Cartwright Amendment's vernacular, it would be "unfair and unjust" to impose the surcharge on car rental drivers but divert those revenues from road-related purposes.

13

¶33        We disagree that the car rental surcharge is more like the motor carrier license tax imposed in 1952 than the 1935 transaction privilege tax imposed on car rental agencies.  Payment of the motor carrier license tax was required to legally use vehicles on our roads.  *See* §§ 2, 17, 1933 Sess. Laws at 473–74, 481–82.  In contrast, the surcharge, like the transaction privilege tax, is imposed on the business of renting vehicles and is not required to be paid before a rental vehicle can be legally operated on roads. Instead, car rental agencies pay licensing fees, like everyone else, to authorize a vehicle's road usage whether the operator is an employee or a customer.  *See* A.R.S. §§ 28-2153(A), -2157 (requiring vehicle registration and payment of registration fees).  And car rental drivers pay licensing fees to their home states/countries as a condition for driving on Arizona roads. *See* A.R.S. §§ 28-3151, -3158(B) (requiring driver's license and payment of fee).  Additionally, the surcharge is no more aimed at car rental customers than was the 1935 transaction privilege tax.  Like the surcharge, the transaction privilege tax could be passed on to car rental customers, yet the tax was not considered a road-user tax and did not fall within the provision.

¶34        That the surcharge is a "special tax" not levied generally on all businesses also fails to distinguish it from the 1935 transaction privilege tax.  When enacted, that tax applied to a limited number of businesses.  *See White v. Moore*, 46 Ariz. 48, 54–55 (1935) (describing 1935 transaction privilege tax and noting "the Legislature thought best not to impose it on . . . all lines of endeavor but only on . . . certain occupations and businesses"), *superseded by statute as stated in Peterson v. Smith*, 92 Ariz. 340, 342 (1962).  Car rental agencies fell within a class of public entertainment and tourist-related businesses, which were taxed at the highest rate.  *See id.* at 55–56.  Regardless of this "special" treatment, the legislature and voters in 1952 did not consider the tax a road-user tax.  Similarly, the anti-diversion provision does not apply to the surcharge, which is part of a taxing plan that imposes a special tax on hotels, simply because it applies only to car rental agencies.

¶35        The court of appeals' interpretation also aligns with the Hayden-Cartwright Amendment, which at least partially drove the Better Roads Amendment. The Hayden-Cartwright Amendment conditioned full federal aid on a state continuing to direct revenues from road-user taxes and fees to road uses. *See supra* ¶ 24.  As explained, revenues from the 1935 transaction privilege tax on car rental agencies were never dedicated solely for road purposes.  Likewise, directing surcharge revenues, which also

derive from taxes imposed on the business of renting vehicles, to non-road purposes does not offend the Hayden-Cartwright Amendment.

¶36 Finally, we agree with ADOR and AzSTA that Saban's "benefits theory" provides no limitation to the term "relating to." If the anti-diversion provision applies to the surcharge, no principled reason exists not to apply it to fees and taxes levied against car sale dealers, automotive repair shops, and the like.

¶37 Justice Bolick's partial dissent accuses us of embarking on a "circuitous journey" that "rewrite[s] constitutional text" to "create[] a loophole" for publicly financed sports stadiums. *See infra* ¶¶ 41–42, 59. Strong words. But they are not backed by rejoinders to our analysis rejecting Saban's "special tax" argument, *see supra* ¶¶ 31–35, despite the fact the dissent adopts Saban's view. *See infra* ¶¶ 49–51 (stating that "a tax is 'relating to' if it is specially directed at the operation or use of vehicles on public highways," and concluding that a surcharge imposed on car rental agencies is such a tax).

¶38 The dissent's effort to ascertain the voters' intent in enacting the anti-diversion provision by parsing language from the Hayden-Cartwright Amendment is unpersuasive. *See infra* ¶¶ 45–49. Neither the provision nor the Pamphlet recited (or even mentioned) the language seized on by the dissent, meaning that language almost certainly had no bearing on voters' intent. Also, the provision was not enacted to comply with the Hayden-Cartwright Amendment and obtain federal funding. *See infra* ¶ 49 ("Arizona voters implemented the Hayden-Cartwright Amendment through the anti-diversion clause."). Arizona had already been receiving federal funding for roads at the time the provision was adopted in 1952. *See* Pamphlet, *supra*, at 5. Necessarily, therefore, the state had already complied with the Hayden-Cartwright Amendment by devoting road-user taxes—which did not include the "special" transaction privilege tax placed on car rental agencies—to road uses. Proponents of the provision were driven by the desire to ensure that Arizona continued to devote these tax revenues to road uses. *See* Pamphlet, *supra*, at 5 ("Public policy in Arizona has consistently opposed diversion [of road user taxes to non-road purposes], although there have been constant threats to highway funds in bills introduced from time to time in the legislature.").

¶39 In sum, "fees, excises, or license taxes relating to . . . the . . . operation, or use of vehicles" are ones imposed as a prerequisite to, or

triggered by, the legal operation or use of a vehicle on a public road. The surcharge falls outside this definition and therefore does not violate the anti-diversion provision.

**CONCLUSION**

**¶40** For the foregoing reasons, we affirm the court of appeals' opinion. We reverse the tax court's judgment in favor of Saban and remand with directions to enter judgment in favor of ADOR and AzSTA and for any further required proceedings consistent with our opinion. Finally, we vacate the tax court's refund order.

———————

BOLICK, J., concurring in part and dissenting in part.

**¶41** The majority today concludes that our constitution's anti-diversion clause, which requires that revenues derived from taxes relating to the operation of motor vehicles must be allocated for public highways, does not apply to a tax relating to the operation of motor vehicles. Because I believe that the best route to a constitutional destination is usually a straight line, I must forsake the majority's circuitous journey. I therefore respectfully dissent from Part II of the majority opinion, while joining the Court's Commerce Clause analysis with some reservations.

### *Anti-diversion Clause*

**¶42** If we asked a dozen random non-lawyers whether a rental vehicle tax is related to the operation or use of vehicles on the public highways or streets, chances are excellent that unless they perceived a trick question based on the obvious answer, all twelve would say "of course!" While I do not suggest that a term's obvious meaning is always the legal meaning, when our reading diverges markedly from a provision's ordinary meaning, we should have an exceedingly good reason for reaching that conclusion. Even then, we should hew as closely as possible to the text's plain meaning to help resist the temptation to exceed our constitutional boundaries. Even public objectives of the highest order, including (apparently) the building of publicly financed stadiums, do not license us to rewrite constitutional text.

**¶43** We must presume that the amendment's framers consciously and intentionally chose the words they used. *See Rumery v. Baier*, 231 Ariz. 275, 278 ¶ 15 (2013). Our duty is to give effect to those words. *See id.* In giving effect to the words chosen, we start with the words' plain meaning. *See id.*; *Cain v. Horne*, 220 Ariz. 77, 80 ¶ 10 (2009). All agree that the term "relating to" is quite broad; from that we can only properly infer that the framers intended a broad scope. Thus, when we seek to apply a "limiting principle," we should do so in the manner most consistent with the broad language chosen by the amendment's drafters. *See Cain*, 220 Ariz. at 80 ¶ 10; *cf. Johnson v. State ex rel. Dep't of Transp.*, 224 Ariz. 554, 557 ¶ 15 (2010) (citing with approval to another court's rejection of a narrow interpretation of

Federal Rule of Evidence 407 because "this narrow interpretation ignores the literal language of the rule" (internal quotation marks omitted)).

¶44 Instead, the majority construes the term "relating to" in a narrow way that changes its meaning. The Court holds today that "relating to" actually means "triggered by" or a "prerequisite to," *supra* ¶ 39, thereby substituting constitutional text with what the majority determines its authors meant to say. Even under that judicially-constructed rubric, revenues collected from the surcharge here should be allocated to public highways and roadways. And though the term "relating to" as used in the anti-diversion clause is indeed elastic, a linear view of the enactments at issue yields a more straightforward interpretation that does not necessitate rewriting constitutional language.[1]

¶45 It is undisputed that the anti-diversion clause emanated from Arizona's desire to retain federal highway funding. In the Hayden-Cartwright Amendment, Congress mandated that tax revenues derived from the use or operation of motor vehicles would be dedicated to highway funding. Pub. L. No. 73-393, § 12, 48 Stat. 993, 995 (1934). Then the voters approved article 9, section 14 of the Arizona Constitution to effectuate that command. Many years later, the legislature enacted the current surcharge on rental car companies and allocated the funding to sports authorities. Examining the relevant provisions of these three enactments in close proximity is highly probative.

¶46 The pertinent provision of the Hayden-Cartwright Amendment specifically notes that "it is unfair and unjust to tax motor-vehicle transportation unless the proceeds of such taxation are applied to the construction, improvement, or maintenance of highways." Hayden-Cartwright Amendment § 12. Thus, the Amendment directs states wishing

---

[1] I agree with the majority that the Plaintiffs' principal assertion that "relating to" means "connected to" is unpersuasive. *See supra* ¶ 28.

to retain federal highway funding to restrict to highway use revenues derived from

> [s]tate motor vehicle registration fees, licenses, gasoline taxes, and *other special taxes on motor-vehicle owners and operators of all kinds . . . .*

*Id.* (emphasis added). The italicized words are illuminating, as they contain language that is both limiting and broad.

**¶47** First, the term "other special taxes" connotes taxes—like registration fees, licenses, and gasoline taxes—that are directed specifically to the use of motor vehicles. The *ejusdem generis* canon supports this reading: where a general term, such as "other special taxes," follows a list of specific terms, the general term should be construed narrowly to "persons or things of the same general nature or class" as the more specific terms. *Estate of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, 326 ¶ 13 (2011) (quoting *State v. Barnett*, 142 Ariz. 592, 596 (1984)). Consequently, "other special taxes" should be interpreted narrowly to mean relating to the use of motor vehicles as the terms that precede it are of this nature. Thus, the term "special taxes" would not encompass *general* taxes that included the use of motor vehicles but were not specially directed toward them. The "special taxes" phrasing also shows that the Hayden-Cartwright Amendment only implicates taxes that are directed specifically to a particular project rather than general taxes that go to the general fund. *Tax*, Black's Law Dictionary (10th ed. 2014) (defining special tax as "[a] tax levied for a unique purpose").

**¶48** Second, the term "motor-vehicle owners and operators of all kinds" is very broad, and thus is meant to be inclusive, not exclusive. Given the statute's stated purpose, this provision suggests that it is the use of the roads rather than hyper-technical legal distinctions among motor-vehicle owners and operators that should govern the statute's applicability; the effect on the roads is the same regardless.

**¶49** In turn, Arizona voters implemented the Hayden-Cartwright Amendment through the anti-diversion clause, article 9, section 14 of the Arizona Constitution, which provides in relevant part:

> No moneys *derived* from fees, excises, or license taxes relating to registration, *operation, or use of vehicles on the public highways or streets* . . . shall be expended for other than highway and street purposes . . . .

(Emphasis added.)

**¶50** This provision should be read *in pari materia* with the Hayden-Cartwright Amendment as the former implements the requirements of the latter and thus each deals with the same subject matter. *See David C. v. Alexis S.*, 240 Ariz. 53, 55 ¶ 9 (2016) ("Statutes that are in pari materia—those of the same subject or general purpose—should be read together and harmonized when possible."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 252 (2012) ("Any word or phrase that comes before a court for interpretation is part of a whole statute, and its meaning is therefore affected by other provisions of the same statute. It is also, however, part of an entire *corpus juris*. . . . Hence laws dealing with the same subject—being *in pari materia* . . . [,] should if possible be interpreted harmoniously."). Indeed, if the constitutional provision did not fully and faithfully follow the federal statute, Arizona would jeopardize federal highway funds—and ironically, the Court's decision today may risk exactly that—which was precisely why it was adopted. *See* Ariz. Sec'y of State, 1952 Publicity Pamphlet 5 (1952), http://azmemory.azlibrary.gov/digital/collection/statepubs%20/id/106 41 ("Why jeopardize federal aid by allowing any diversion of road user taxes . . . ?" (emphasis omitted)); *id.* at 4 (expressly referring to the Hayden-Cartwright Amendment); *Saban Rent-A-Car LLC v. Ariz. Dep't of Revenue*, 244 Ariz. 293, 299 ¶ 14 (App. 2018) (stating the anti-diversion clause "was enacted in response to federal legislation that conditioned grants of federal highway funds on a state's assurance that revenue 'from State motor vehicle registration fees, licenses, gasoline taxes, and other special taxes on motor-vehicle owners and operators of all kinds' would be used exclusively for highway purposes" (quoting Hayden-Cartwright Amendment § 12)). In that way, the Hayden-Cartwright Amendment provides definition for the subsequent state constitutional provision.

**¶51** Therefore, viewed in this proper context, a tax is "relating to" if it is specially directed at the operation or use of vehicles on public highways. Similarly, the broad terms "use" and "operation" are directed toward the ultimate activity. Again, the text evinces no intent to elevate

form over substance—if the vehicles are used or operated on public highways, then any fee or tax specially directed toward that use implicates the anti-diversion clause.

¶52 That leaves the question of whether the car rental surcharge is such a fee or tax. Once again, we do not need to travel beyond the statutory language itself, for it furnishes the plain answer. A.R.S. § 5-839(C) states in relevant part:

> The surcharge applies to the business of leasing or renting . . . *motor vehicles for hire without a driver, that are designed to operate on the streets and highways of this state . . . .*

(Emphasis added.) The italicized language essentially parallels the wording of the anti-diversion clause. The surcharge's plain language illustrates that it only applies when someone rents a "motor vehicle[] . . . without a driver, . . . designed to operate on the streets and highways of this state"; as such, the taxable event is that the renter of the motor vehicle will be driving it on the public roads.

¶53 A straight line can be drawn from the Hayden-Cartwright Amendment to the anti-diversion clause to the statute before us. The "limiting principle" that the majority searches for at great length is supplied by the relevant text of these provisions. The surcharge is a special tax directed toward the use or operation of vehicles on public roads, and the revenues it generates must be allocated to public roads.

¶54 When the relevant constitutional and statutory language resolves the dispute, as it does here, it is with great hazard that we stray beyond it. *State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 604 ¶ 67 (2017) (Bolick, J., concurring in part and in the result) ("We look first to the language of the provision, for if the constitutional language is clear, judicial construction is neither required nor proper." (quoting *Perini Land & Dev. Co. v. Pima County*, 170 Ariz. 380, 383 (1992))); *accord, e.g., State v. Winegardner*, 243 Ariz. 482, 489 ¶ 29 (2018) (Lopez, J., dissenting in part and concurring in the result) ("In doing so, we glossed over the Rule's plain language to find a much narrower meaning in its legislative history. But our decisions repeatedly emphasize that we should apply plain meaning before resorting to secondary interpretation methods such as legislative history."); *Butler Law Firm, PLC v. Higgins*, 243 Ariz. 456, 459 ¶ 7 (2018); *Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 449 ¶ 45 (2018) (Timmer, J.,

dissenting in part and concurring in part); *State v. Holle*, 240 Ariz. 300, 302 ¶ 11 (2016).

**¶55** The trial court employed a similar analysis and reached the correct result, holding that "the class of taxable transactions is defined by the relationship of those transactions to the rental of cars. That the [surcharge] relates to the use of vehicles on the public highways or streets is plain. Its receipts may therefore be applied only to one or more of the purposes set down by the Constitution. The construction and maintenance of athletic facilities [are] not among those purposes."

**¶56** Although we need (and should) not go beyond constitutional and statutory text in resolving this case, this analysis, unsurprisingly, also accords with the drafters' stated intent. As the majority observes, the amendment's drafters admonished that the enactment would not alter the then-current tax system. *Supra* ¶ 31. This reading is consistent with that stated intent: general taxes that affected motor vehicles among other goods or services would be unaffected, while taxes and fees directly applied to motor vehicles or their use or operation would be subject to the amendment's constraints.

**¶57** The majority creates an exception to the anti-diversion clause that defeats both its language and intent. That the surcharge is assessed not directly on individuals but on businesses, who pass it on to consumers, is irrelevant in a constitutional provision that focuses on use and operation of motor vehicles on public highways. *Cf. Maryland v. Louisiana*, 451 U.S. 725, 737 (1981) (concluding that consumers had standing because "the Special Master proper[l]y determined that 'although the tax is collected from the pipelines, it is really a burden on consumers'"). More importantly, whether the tax is borne by the owners (the rental car companies) or the operators (vehicle renters) makes no difference from the perspective of effectuating the requirements of the Hayden-Cartwright Amendment, which expressly encompasses both.

**¶58** Even so, clearly it is the vehicle renters, as vehicle operators, and not the rental car companies that are the ultimate object of the surcharge, as the arguments in favor of adoption of the surcharge in the voter pamphlet repeatedly emphasized. *See, e.g.*, Ariz. Sec'y of State, 2000 Publicity Pamphlet Sample Ballot for the Tourism & Sports Authority 10 (2000) [hereinafter 2000 Publicity Pamphlet], https://ia601408.us.archive.org/31/items/PubPamp2000_201902/

22

Pub%20Pamp%202000.pdf ("The tax burden will fall primarily on visitors to the County."); *id.* at 12 ("[V]isitors to the region, through a modest increase in the cost of hotel and rental car use, will absorb a large portion of the cost . . . ."); *id.* at 14 ("Finally, the financing created by this proposition will be born[e] almost entirely by the out of state visitors."); *id.* at 16 ("But the best part of the proposal is that it will cost Arizona residents next to nothing. As much as 95% of the new hotel and car rental taxes will be borne by visitors to our state."); *id.* at 17 ("All of these benefits to our communities can be provided with the passage of Proposition 302 without increasing taxes paid by local residents, and *without negatively impacting the car rental and hotel industries.*" (emphasis added)). The prescient forecast by those in favor of shifting the burden of paying for AzSTA tourism projects to rental car users themselves played out exactly as planned, as the trial court found, which shows precisely why the surcharge violates the anti-diversion clause. *See supra* ¶ 3 (noting the rental car companies pass the surcharge on to the vehicle renters). The surcharge is imposed on rental car users for their road use; thus, its revenues must be earmarked for road use projects only. Because they are not, the surcharge violates the anti-diversion clause.

**¶59** The Court has created a loophole that allows the legislature and those seeking its favor to divert funding from highways to other purposes, without the pesky inconvenience of constitutional amendment. For the foregoing reasons, and with great respect to my colleagues, I dissent on this issue.

### *Dormant Commerce Clause*

**¶60** I agree with my colleagues that the statute does not violate the "dormant" Commerce Clause, as presently construed by the U.S. Supreme Court.[2] However, I find in the record more evidence than my colleagues of an intent to place the predominant economic burden of this

---

[2] The Commerce Clause effectuated one of the major purposes of our federal constitution, which was to prevent parochial trade barriers erected by states favoring their own domestic industries, thereby ensuring to all the abundant benefits of free trade. *Hughes v. Oklahoma*, 441 U.S. 322, 325–26 (1979). It did so by vesting in Congress, rather than the states, the power to regulate interstate commerce. This application of the Commerce Clause is far from dormant, as wine-lovers, among others, can attest. *Granholm v. Heald*, 544 U.S. 460 (2005).

tax on out-of-state consumers, who after all are much more likely to rent cars in Arizona for non-replacement purposes (for which more-favorable terms apply on the statute's face) than Arizona residents.[3]  And, pertinent to the political equation here, out-of-state visitors are unable to vote to protect their economic interests, so they represent an appealing revenue source.

¶61            "[A] tax may violate the Commerce Clause if it is facially discriminatory, has a discriminatory intent, or has the effect of unduly burdening interstate commerce."  *Amerada Hess Corp. v. Dir., Div. of Taxation*, 490 U.S. 66, 75 (1989).  In *Commonwealth Edison Co. v. Montana*, the Court rejected a Commerce Clause claim against a facially nondiscriminatory tax that disproportionately burdened out-of-state businesses as the Court reasoned the tax was related to activities and benefits taking place inside the state.  453 U.S. 609, 618–29 (1981).  By contrast, in *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, the Court struck down a differential tax burden that "penalize[d] the principally nonresident customers of businesses catering to a primarily interstate market."  520 U.S. 564, 576 (1997).

¶62            As a result, this question is very close.  Plaintiffs have argued this case as one of discriminatory intent, and indeed the statute is facially nondiscriminatory and has been applied in a nondiscriminatory way.  The U.S. Supreme Court has not invalidated state policies solely on the basis of discriminatory intent.  *But cf. S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593–96 (8th Cir. 2003) (invalidating a constitutional amendment on the basis of "discriminatory purpose").  Given the Supreme Court's conflicting precedents and that it has not yet provided significant guidance on how to treat a Commerce Clause claim based on discriminatory intent, I join the majority in denying relief on that claim.

---

[3]  One quote from the publicity pamphlet in particular sums it up with admirable candor: "[T]he best part of the proposal is that it will cost Arizona residents next to nothing.  As much as 95% of the new hotel and car rental taxes will be borne by visitors to our state."  2000 Publicity Pamphlet, *supra*, at 16; *see also supra* ¶ 58 (collecting quotes evincing discriminatory intent).